# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **NO. CR 07-1484 RB** |
| | ) | |
| MARTIN J. VILLEGAS-ESPINOSA, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** came before the Court on Defendant's Motion to Suppress (Doc. 46), filed on August 16, 2007, and the Government's Motion in Limine Regarding Reverse 404(b) Evidence (Doc. 54), filed on August 31, 2007.  A hearing on these motions was held on September 28, 2007. Having considered the submissions of counsel, testimony, relevant law, and being otherwise fully advised, I issue these findings of fact and conclusions of law.

### Findings of Fact

1.     On May 2, 2007, United States Border Patrol Agent Pedro Alberto Flores[1] was working at the primary inspection area of the fixed border patrol checkpoint on U.S. Highway 54. The checkpoint is located twenty miles south of Alamogordo, New Mexico, and approximately sixty miles north of El Paso, Texas.

2.     Agent Flores was assigned to question motorists in the primary inspection area. Border Patrol Agent Eduardo J. Ortiz[2] was also present at the primary inspection area.  Agent Ortiz

---

[1] Agent Flores completed the October 2006 Border Patrol academy at the Federal Law Enforcement Training Center in Artesia, New Mexico.  He has been assigned to the Border Patrol station in Alamogordo since March 2007.

[2] Agent Ortiz has four years of experience as a border patrol agent

stood about four feet behind Agent Flores in order to oversee and train Agent Flores. Both agents worked the 8:00 a.m. to 4:00 p.m. shift that day. Traffic was normal and five or six cars were in queue to pass through the checkpoint.

3.      Just after 2:00 p.m., a white 1995 Volkswagen Jetta sedan approached the primary inspection point. Three people were inside the Jetta. Defendant was in the back seat. Another man, Co-Defendant Jose Manuel Sanchez-Morales, was driving. Mary Ann Salinas was in the front passenger seat.

4.      While the Jetta was in line, Agent Ortiz noticed that the occupants were conversing, yet the driver, Mr. Sanchez, never looked at his passengers as he spoke. Instead, Mr. Sanchez stared straight ahead and gripped the wheel. Agent Ortiz found this very unusual.

5.      Agent Flores greeted Mr. Sanchez and asked him and the other occupants to state their citizenship. Mr. Sanchez replied that he was a naturalized United States citizen. Ms. Salinas replied that she was a United States citizen by birth. Defendant stated he was a legal permanent resident. Agent Flores asked Defendant to produce his legal permanent resident card.

6.      As Defendant searched for the card in his wallet, Agent Flores asked Mr. Sanchez about their origin and destination. Mr. Sanchez replied they were coming from El Paso and going to Tularosa, New Mexico to pick up Defendant's vehicle, which had broken down. Mr. Sanchez gripped the wheel in a very firm manner.

7.      Defendant produced his valid immigration card. Agent Flores asked Defendant what had happened to Defendant's car. Defendant appeared nervous, stared straight ahead for a "good five seconds," and then replied that the car had overheated. Defendant joked in Spanish "it's a worthless car, oh you know those cars." Defendant appeared to move back and forth as he spoke. Defendant stated that it was a bad car and they were going to fix it or tow it. Agent Flores found

Defendant's answers and demeanor to be "different" and unusual.

8.      Agent Ortiz asked Mr. Sanchez about the car.  Sanchez looked back at Defendant. Defendant returned the look with a blank stare and stated the car had overheated.  Agent Ortiz asked Mr. Sanchez where in Tularosa the car was located.  Mr. Sanchez looked back at Defendant and Defendant replied "there in Tularosa."  Agent Ortiz asked how long they planned to stay in Tularosa. Mr. Sanchez replied they planned to stay long enough to fix the car or tow it.

9.      Agent Ortiz received permission from Mr. Sanchez to search the trunk.  Mr. Sanchez opened the trunk from inside the Jetta.  In the trunk, the agents observed two open travel bags, each about the size of a gym bag.  A woman's white blouse and some other clothing were sticking out of one of the bags.  The agents asked the occupants of the Jetta about the luggage.  Mr. Sanchez told the agents that one bag belonged to both Mr. Sanchez and Ms. Salinas and the other bag belonged to Defendant.  The agents noted that the presence of luggage was inconsistent with the story given by the occupants of the Jetta.

10.      The trunk did not contain a trailer hitch, a tow bar, or large tools consistent with fixing or towing a car.[3]  Agent Ortiz thought this was unusual because, in Agent Ortiz's experience, persons passing thought the checkpoint to pick up broken down vehicles usually bring such equipment with them.

11.      Agent Ortiz asked, and Mr. Sanchez consented, to move the Jetta to the secondary inspection area.  The occupants exited the Jetta and waited nearby as a canine was used to search the Jetta.  The canine alerted to the passenger-side center console.  Agents discovered a hidden compartment between the firewall and the console.  Concealed inside the compartment, agents

---

[3]  Agent Ortiz later learned that the trunk contained a small ammunition box containing small tools.

3

discovered three bundles containing cocaine.

12.     The occupants of the vehicle were arrested and taken inside the checkpoint building. Each occupant was placed in a separate holding cell.  The holding cells consist of several glass-enclosed rooms in a portable building.  Each holding cell measures approximately 12' by 20' and contains a metal bench, toilet, and sink.

13.     Agent Ortiz and Border Patrol Agent Ramon Fernandez went into Defendant's holding cell to interview him.  Agent Ortiz advised Defendant of his Miranda rights, using two Forms I-214, which contained Miranda warnings; one in English and one in Spanish. (Govt. Exs. 1 and 2.)  Agent Ortiz read the top part of the form to Defendant verbatim and asked Defendant if he understood his rights.  Defendant indicated that he understood his rights.  Defendant signed one form at 2:48 p.m., (Govt. Ev. 1), and the other form at 2:52 p.m. (Govt. Ex. 2.)

14.     Agent Ortiz asked Defendant if Defendant was willing to make a statement. Defendant stated he did not want to make a statement.  Agent Ortiz understood that Defendant invoked his right to remain silent.  At that point, all conversation between Defendant and Agent Ortiz stopped.  While other border patrol agents asked Defendant about biographical information for booking purposes, Agent Ortiz called the Drug Enforcement Administration ("DEA") office in Las Cruces, New Mexico.

15.     DEA Agents Michael Armendariz and Tenille Kinsey arrived at the checkpoint between 5:00 and 5:30 p.m. that day.  During the intervening two and a half hours, Defendant remained in the holding cell.  Agent Ortiz turned the case over to Agents Armendariz and Kinsey by briefing them on the case and giving them copies of Govt. Exs. 1 and 2.  It is standard practice of Agent Ortiz to advise suspects of their Miranda rights using Form I-214 and to turn such forms over to responding DEA agents.  Agent Ortiz left the checkpoint at about 5:40 p.m. that day. I fully

4

credit the testimony of Agent Flores and Agent Ortiz.

16.     DEA Agent Michael Armendariz has worked for the DEA since February, 2004. Before his employment with the DEA, Agent Armendariz worked for the Dallas Police Department for ten and a half years.  Agent Ortiz informed Agent Armendariz that the suspects made no statements and gave him copies of Govt. Exs. 1 and 2.  Agent Armendariz was on notice that Defendant had invoked his right to remain silent.  Although Agent Armendariz testified at the hearing that Agent Ortiz did not tell him that Defendant invoked his right to remain silent and did not give him Govt. Exs. 1 and 2 until after Agent Armendariz interviewed Defendant, I find Agent Armendariz's testimony on this particular point incredible.

17.     Agent Armendariz, Agent Kinsey and Defendant were present in Defendant's holding cell.  Defendant was seated on the bench and the DEA agents stood near a wall.  Defendant understood the agents' questions.  The DEA agents were unarmed and did not physically threaten Defendant.  Agent Armendariz spoke with Defendant in Spanish.

18.     Neither Agent Armendariz nor Agent Kinsey gave Defendant Miranda warnings. Instead, Agent Armendariz asked Defendant if he understood his rights.  Defendant stated he had been read rights and he understood them.  Agent Armendariz asked Defendant if Defendant had any problem answering questions.  Defendant responded he did not.  Defendant did not appear to be confused and indicated he was willing to talk.

19.     Agent Armendariz asked Defendant if the drugs belonged to him and tried to obtain information about the source of the drugs.  Agent Armendariz told Defendant that his fingerprints would be found on the drug packaging.  Agent Armendariz asked Defendant his destination. Defendant responded they were going to Tularosa to pick up a vehicle.  Agent Armendariz asked the location of the vehicle.  Defendant was unable to give a definitive answer.  Defendant stated the

5

vehicle had broken down. Defendant stated that, perhaps, Defendant's brother had picked up the vehicle. Defendant stated that Defendant's brother was not with him when the car broke down and Defendant had not been in contact with Defendant's brother.

20.     Agent Armendariz asked Defendant how Defendant's brother would know that the vehicle had broken down. At that point, Defendant stated that he did not want to answer any more questions. Agent Armendariz terminated the interview except for questions concerning booking information. Agents Armendariz and Kinsey spent about fifteen minutes with Defendant. The DEA agents issued no threats or promises to Defendant. Agent Kinsey participated in the interview process.

## Conclusions of Law

1.     Defendant argues his post-arrest statements should be suppressed because they were obtained in violation of Miranda. "The seminal case of *Miranda v. Arizona*, 384 U.S. 436 (1966), stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent." *United States v. Alexander*, 447 F.3d 1290, 1293 (10th Cir. 2006). If a suspect invokes this right, then the admissibility of any further statements by the suspect depends "on whether his right to cut off questioning was scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quotation marks omitted). If an individual expresses his desire to remain silent, all interrogation must cease. *Id.*, 423 U.S. at 100.

2.     In limited circumstances police may reopen questioning, but only if four conditions are met:

> (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of Miranda warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

*Mosley*, 423 U.S. at 104-05.

  3. Defendant unequivocally invoked his right to remain silent after Agent Ortiz read him his rights. Indeed, Agent Ortiz understood Defendant invoked his right to remain silent and properly stopped all questioning concerning the offense. Two and a half hours later, the second interrogation occurred. The interval was substantial under the circumstances of this case. *See United States v. Rambo*, 365 F.3d 906, 911 n.5 (10th Cir. 2004) (recognizing that there is no definite time police must forego questioning).

  4. The DEA agents did not give Defendant a fresh set of Miranda warnings before the second interrogation. The subject matter of the second interrogation was related to the subject matter of the first. The Government implicitly recognizes the problem with the DEA agents' actions and relies on *United States v. Orduna-Martinez*, 491 F.Supp.2d 1021 (D. Kan. 2007) to excuse the Miranda violation. However, *Orduna-Martinez* is readily distinguishable from the case sub judice.

  5. In *Orduna-Martinez*, the defendant was stopped in Kansas by a state trooper. *Orduna-Martinez*, 491 F.Supp.2d at 1024. Subsequently, Topeka Police Officer Vargas arrived at the scene to serve as a Spanish interpreter. *Id*. At 9:38 a.m., Officer Vargas read defendant his Miranda rights in Spanish, and the defendant replied that he did not want to talk to him about what happened. *Id*. Officer Vargas immediately stopped talking to the defendant. *Id*. DEA Agent Bailiff arrived later, wanting to see if the defendant would cooperate in a controlled delivery. *Id*. At 12:25 p.m., at Agent Bailiff's request, Officer Vargas again read the Miranda warnings in Spanish to the defendant. *Id*. Defendant replied, "I won't talk to you, but I'll answer his questions," nodding at Agent Bailiff. *Id*. In the course of answering Agent Bailiff's questions, defendant made incriminating statements. *Id*.

  6. In the instant case, Agents Armendariz and Kinsey interrogated Defendant without

7

reading Defendant his Miranda rights a second time.  Agent Armendariz indicated it is standard operating procedure for the DEA to interrogate suspects when summoned to fixed border patrol checkpoints regardless of whether the suspect has invoked his right to remain silent.  Indeed, Agent Armendariz testified that he does not read the I-214 forms that are routinely handed over to him by border patrol.  I am troubled by such a practice that appears to allow for additional questioning after a suspect has invoked his right to remain silent.

7.      *Mosley* entails an inquiry into all of the relevant facts to determine whether the suspect's right to remain silent has been "scrupulously honored."  *See Mosley*, 423 U.S. at 104-06.  Consideration of all the relevant facts in this case leaves me with the firm conviction that Defendant's right to cut off questioning was not respected.  Accordingly, all statements made to Agents Armendariz and Kinsey will be suppressed as obtained in violation of Miranda.

8.      Defendant alternatively suggests his post-arrest statements should be suppressed because he was induced to make the statements by implied promises or threats.  When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt.  *See United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997) (citing *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)).  When determining the admissibility of a defendant's statements, voluntariness depends upon an assessment of "the totality of all the surrounding circumstances," including "both the characteristics of the defendant and the details of the interrogation."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

9.       In determining the voluntariness of a statement, the following factors are considered: (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and

(5) whether the defendant was subjected to physical punishment. *Glover*, 104 F.3d at 1579 (citing *Schneckloth*, 412 U.S. at 226).

10.      There was no evidence presented that the age, intelligence, or education of Defendant affected the voluntariness of the statements.  The two-and-a-half hour detention was not inordinately long and the questioning lasted no more than fifteen minutes.  While Defendant was not given a fresh set of Miranda warnings advising of his constitutional rights, he was not subjected to physical punishment.  None of the evidence indicates that the statements were obtained by government acts, threats, or promises that permitted Defendant's will to be overborne.  The statements will not be suppressed as involuntary.

11.      The Government moves in limine to prevent Defendant from examining witnesses concerning a prior incident where Co-Defendant Jose Manuel Sanchez-Morales and Mary Ann Salinas were stopped and $129,520 in cash was found concealed in their vehicle.  The prior incident occurred on February 17, 2005 in Kansas.  After a traffic stop, a narcotics canine alerted on the currency, which was hidden in a compartment in their vehicle.

12.      Evidence of a witness' other wrongs, acts, or crimes is admissible for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him. *United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005).  Admissibility of reverse 404(b) evidence depends on a "straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues." *Id*. (citations omitted).

13.      A lower standard of similarity between the crime at issue and "other crimes" evidence governs reverse 404(b) evidence because prejudice to the defendant is not a factor. *Montelongo*, 420 F.3d 1174. (citations omitted).  Where the key issue at trial is who was responsible

9

for the contraband, cross-examination based on 404(b) is appropriate. *Id*.

14.     This case is very similar to *Montelongo*. The cocaine was found in a concealed compartment in a car driven by Mr. Sanchez with Ms. Salinas as a passenger. In the event that Mr. Sanchez or Ms. Salinas testify, and take the position that they were mere dupes in this case, Defendant may impeach them with evidence of the prior incident.

**WHEREFORE,**

    **IT IS ORDERED** that Defendant's Motion to Suppress Evidence is **GRANTED**.

    **IT IS FURTHER ORDERED** that Plaintiff's Motion in Limine Regarding Reverse 404(b) Evidence is **DENIED**.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**